UNITED STATES DISTRICT COURT

DISTRICT COURT OF OREGON

PORTLAND DIVISION

DEBORAH J. CANTRELL,                                    3:10-cv-03050-AC

                            Plaintiff,          OPINION AND
                                                        ORDER

      v.

MICHAEL ASTRUE, as
Commissioner of Social Security,

                           Defendant.

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff, Deborah J. Cantrell ("Cantrell"), filed this action under 42 U.S.C. § 405(g) of the

Social Security Act (the "Act"), to review the final decision of the Commissioner of Social Security

(the "Commissioner") who denied her social security disability insurance ("DBI") and supplemental

OPINION AND ORDER                          1                              {CKH}

security income benefits ("SSI") (collectively "Benefits").

The court finds the Administrative Law Judge ("ALJ") considered relevant indicators of credibility, and offered clear and convincing reasons for discrediting Cantrell's reports about her pain. The court also finds the ALJ properly considered, before rejecting, opinions of Kathy Finley, F.N.P ("Nurse Finley"), Michelle Kaplan, M.D. ("Dr. Kaplan"), and Ryan Scott, Ph.D. ("Dr. Scott"). Finally, the court finds any omission of conditions made by the ALJ in step two of the sequential disability analysis to be harmless error. For these reasons, set forth in more detail below, the court affirms the Commissioner's decision to deny Cantrell disability benefits.

*Background*

I. Procedural History

On January 31, 2006, Cantrell filed applications for Benefits alleging an onset date of April 20, 2005.[1]   (Tr. 123, 130.)[2]   These applications were denied initially (Tr. 86, 91), upon reconsideration (Tr. 99, 102), and by an ALJ after a hearing. (Tr. 27.) The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner on April 8, 2010. (Tr. 1.)

---

[1]Cantrell actually alleged four different onset dates throughout the administrative record: 1) June 30, 1990, in her application for supplemental security income (Tr. 123); 2) July 21, 2005, in her application for disability insurance benefits (Tr. 130); 3) April 20, 2005, in her Disability Report – the day on which she became unable to work because of her health conditions (Tr. 145); and 4) July 20, 2005, in her Disability Report – the day on which she stopped working after she was fired. (Tr. 145.) The court considers her onset date to be April 20, 2005, because the ALJ states that Cantrell's disability began on that date, and neither party disputes that finding. (Tr. 27.)

[2]Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed on May 4, 2011. (Docket # 12.)

II. Factual History

Cantrell is currently forty-two years old and lives in Springfield, Oregon, with her two young sons. She has completed four or more years worth of college credit, after taking her last class in May 2003. (Tr. 156.) Cantrell has worked as a janitor, a construction manager, an electrician, and a computer technician. (Tr. 172.) She worked the longest as an electrician – a period totaling about sixteen years. (Tr. 172.) She has not been employed since July 20, 2005. (Tr. 145.) Cantrell alleges disability based on degenerative disc disease, bulging discs, bursitis,[3] sciatic nerve problems, tendonitis, carpal tunnel syndrome, chronic sinusitis, irritable bowl syndrome ("IBS"),[4] chronic fatigue, fibromyalgia, chronic myofacial pain, bipolar disorder, depression, osteoarthritis, gastroesophageal reflux disease ("GERD"),[5] diabetes, chronic migraines, high cholesterol, asthma, and chronic bronchitis. (Tr. 145.) She is prescribed and takes seventeen different medications for her illnesses. (Tr. 199-201.) Cantrell's earnings record establishes she has acquired sufficient coverage to remain insured through March 31, 2009. (Tr. 142, 169.)

   *A. Claimant Testimony*

———————————————

[3] Cantrell's Disability Report lists "bracitis," which the court assumes to be a misspelling of "bursitis" because "bracitis" does not appear in the Merriam-Webster medical dictionary. MEDLINE PLUS MEDICAL DICTIONARY, MERRIAM-WEBSTER, http://www.merriam-webster.com/medlineplus/bracitis (last visited Feb. 17, 2012). The ALJ also lists "bursitis," and not "bracitis," as one of Cantrell's alleged ailments. (Tr. 30.)

[4] Irritable bowel syndrome is often abbreviated with "IBS", which Cantrell uses in her Disability Report. *See Irritable Bowel Syndrome and CAM: At a Glance*, NATIONAL INSTITUTES OF HEALTH, http://nccam.nih.gov/health/digestive/IrritableBowelSyndrome.htm (last visited Feb. 6, 2012).

[5] Gastroesophageal reflux disease is the full title for the acronym "GERD," which Cantrell lists in her Disability Report. *See Heartburn, Gastroesophageal Reflux (GER), and Gastroesophageal Reflux Disease*, NATIONAL DIGESTIVE DISEASES INFORMATION CLEARINGHOUSE, http://digestive.niddk.nih.gov/ddiseases/pubs/gerd/ (last visited Feb. 6, 2012).

Cantrell testified that she had surgery in both hands for carpal tunnel syndrome in 2002, somewhere in St. Louis. (Tr. 48.) When she went for testing before the surgery, she was told that her carpal tunnel was so severe that "they wondered how [she] functioned." (Tr. 63.) Allegedly, the surgeons told her that they could not address the problem in a single surgery and that a second surgery would be necessary. (Tr. 49.) Cantrell reported at the hearing, "I've been putting it off until I can't stand it anymore for obvious reasons." (Tr. 49.) She justified her recent lack of complaints to doctors about pain from carpal tunnel syndrome with the explanations that pain pills and braces were the only treatment for the problem besides surgery, she already had medication and wrist braces, and she was not ready for a second surgery. (Tr. 49.) Still, she claimed of increasing pain in her fingers and arms, stemming from the shoulders, that felt like a tingling or burning sensation. (Tr. 50.)

Cantrell suffers from pain while typing or writing for any period of time. If she continues to type or write after the pain has started, her fingers will turn numb, so she has to take frequent breaks when she is writing or drawing. (Tr. 50.) However, she admitted that she could type for short periods of time. (Tr. 63.) Cantrell explained that due to her wrist pain she would only be able to pick up pennies on a table if she slid them off the side of the table. (Tr. 62.) She has to pick up a piece of paper that same way, by sliding it off a table. (Tr. 63.)

The bone spurs in Cantrell's feet were diagnosed in Illinois a few years ago and were treated with Cortisone shots. (Tr. 51.) The pain from Cantrell's bone spurs has gotten worse since her initial Cortisone treatment in Illinois, and now feels like a burning sensation in her leg. (Tr. 51.) According to Cantrell, standing for more than five or ten minutes, or walking a couple of blocks, triggers the pain in her feet. (Tr. 52-53.) Cantrell testified at the hearing that Nurse Finley, most

recently treated her bilateral bone spurs with Cortisone injections, and sent Cantrell to get X-rays taken. (Tr. 52.) Her obesity contributes to her foot pain. (Tr. 72.) Cantrell testified at the hearing that "they thought I was diabetic so they put me on medication which made me gain more weight." (Tr. 72.)

At one point during the hearing, Cantrell asked the ALJ if she could stand because her hip was going numb due to the "pinched nerve in [her] . . . back or sciatica or whatever you call it." (Tr. 53.) She reported that doctors had not recently recommended testing in response to her back pain, because all the tests had been done in Illinois. (Tr. 53.) However, she did have an MRI on her lumbar spine in Oregon that came back normal. (Tr. 57, 59.) Cantrell recounted that the doctor who interpreted the MRI told her that nerve damage would not show up on the image. (Tr. 57.)

Cantrell reported having pain and swelling in her neck that happens "all the time," and keeps her awake at night. (Tr. 72.) Cantrell testified that she expected the neck pain was caused by the degenerative disc disease. (Tr. 72.) She described her condition as " migraines that start from back here at my neck and they work their way out the right side and it's such great pain that I can't do anything except take major pain pills and go to sleep." (Tr. 72-73.)

Two counselors have diagnosed Cantrell with depression. Cantrell sought treatment from the first counselor in California during her battle for legal custody of her children in 1994 or 1995. (Tr. 64.) Cantrell testified in the hearing that she had no way of anticipating what her mood would be on any given day. (Tr. 64.) She called her depression the "super woman syndrome"– some days she felt like she could do things that she should not and after she did them, she was in severe pain. (Tr. 64.) On the other hand, she had days where she could hardly get out of bed and take care of her kids. (Tr. 65.) According to Cantrell, the slightest event reminded her of her lifetime of traumatic

events, and set off her depression.  (Tr. 66.)

Cantrell testified that she has not taken her Trazadone (medication for depression, post-traumatic stress, and bipolar disorder) as often as prescribed because the combination of all seventeen medications often made her sicker or knocked her out so that she was unable to function at all.  (Tr. 67.)  In her Function Report, Cantrell wrote, "my meds make it hard, if not impossible to remember things, complete tasks, concentrate, understand, follow instructions."  (Tr. 185.)

Cantrell testified that she cannot drive when she is on medication, so she limits her trips to town.  (Tr. 70.)  For example, she did one big grocery shopping trip a month.  (Tr. 71.)  She did drive to her medical appointments in Shady Cove.  (Tr. 71.)  In her Pain Questionnaire, Cantrell stated that on the days that she took her medication, she had to sleep for two to three hours to be able to function.  (Tr. 189.)

At the time of the hearing, Cantrell took pain medication three to four times a day depending on her pain, including one for the nerve-ending pain from sciatica and disk disease prescribed by Nurse Finley.  (Tr. 68-69.)  When the ALJ asked Cantrell why she took pain medication for her spine after her MRIs revealed that her spine was in alignment, she said, "the two [car] accidents knocked the disk out of place and the third one knocked them back in.  And that last one I had done was taken right after the third accident and I suggest (sic) that they've come back out since then."  (Tr. 69.)

*B. Vocational Expert Testimony*

The ALJ posed the following hypothetical to the vocational expert ("VE") in attendance at the hearing:  a thirty-nine year old individual who would be limited to light work; would need to avoid concentrated exposure to fumes, gases, et cetera; would be unable to stand or walk for more than one half hour; and would be unable to have close interaction with co-workers and the general

public. (Tr. 77-78.) The VE responded that an individual with those limitations would not be able to perform any of Cantrell's prior gainful employment. (Tr. 78.) However, the VE identified that such an individual would be able to work as an assembler of small products, machine trimmer, or addresser. (Tr. 78.) Those three positions would not require prolonged standing or walking, but would necessitate frequent use of the hands. (Tr. 79.) If the individual had only occasional use of her hands, those occupations would be unavailable. (Tr. 79.)

Cantrell's attorney posed a second scenario with an individual who could lift or carry items less than ten pounds, could stand or walk no more than two hours in an eight-hour work day, and could sit only six hours in an eight-hour work day. The VE responded that such an individual would not be qualified for any jobs in the national or regional economy because those limitations would prohibit the individual from working a full-time job. (Tr. 79.)

C. *Medical Evidence*

Cantrell primarily complains of sinus infections, and back and neck pain resulting from a motor vehicle accident that occurred in Illinois before Cantrell moved to Oregon. Since 2005, she has been regularly treated for obesity, degenerative disc disease, disc bulges, asthma, sinusitis, and variants of migraines. Before moving to Oregon, Cantrell began treatment with the Belleville Family Health Center in Belleville, Illinois, for carpal tunnel syndrome, and pain in her neck and back after a car hit her vehicle from behind. (Tr. 441.)

When Cantrell moved to Oregon, she established care at Eagle Point Medical Clinic with Nurse Finley on June 29, 2005. (Tr. 243.) Cantrell explained to Nurse Finley that she suffered from migraine headaches all the time. (Tr. 243.) Nurse Finley's only clinical examination during that initial visit noted stiffness in the neck and pain at the base of the skull after palpation. (Tr. 243.)

She also ordered an X-ray of Cantrell's spine at C4-5 and C5-6. (Tr. 249.) The X-ray results showed age-compatible degenerative changes, but no acute pathology. (Tr. 249.) However, Nurse Finley's assessment included classical and tension migraine headaches, cervical radiculopathy, fibromyalgia, degenerative disc disease and bulging discs of the cervical neck, and reflux symptoms. (Tr. 243.)

Cantrell returned to Nurse Finley for lidocaine injections on July 29, 2005. (Tr. 242.) After examination revealed pain in her posterior right shoulder, posterior right scalp, and at several fibromyalgia trigger points, Nurse Finley administered injections in Cantrell's right shoulder and scalp. (Tr. 242.) During that same visit, Nurse Finley refilled Cantrell's pain medications for her fibromyalgia, carpal tunnel syndrome, and migraine headaches. (Tr. 242.) However, she noted that Cantrell continued to smoke three quarters of a pack of cigarettes each day and was "not ready to quit at th[at] time." (Tr. 242.) On August, 10, 2005, T. Myer, F.N.P., at Eagle Point Medical Clinic told Cantrell that she needed to quit smoking. (Tr. 241.)

An MRI of Cantrell's cervical spine taken on August 17, 2005, showed normal spinal cord signal, spinal cord morphology, and vertebral alignment. (Tr. 246.) In addition, the MRI revealed either minimal posterior disc bulges or marginal osteophytes at the C5-6 level, or both. However, neural impingement or stenosis were not apparent. (Tr. 246.)

On September 15, 2005, Nurse Finley referred Cantrell for steroid injections at the C5-6 spine and nerve conduction studies, after Cantrell complained of a "headache that just won't go away" and pain in the upper right extremity – including her right elbow. (Tr. 240.) Cantrell informed Nurse Finley that she had previously had surgery for carpal tunnel syndrome in both arms, and had been told at the time that surgery would not "completely resolve the problem." (Tr. 240.) Also during that visit, Nurse Finley noted that Cantrell was still smoking fifteen cigarettes per day

even though she had switched to filtered cigarettes. (Tr. 240.)

The last report from Nurse Finley in the record is dated September 26, 2005, after Cantrell had reported to the Providence Medical Center emergency room with labored breathing. (Tr. 238.) The emergency room attendants gave Cantrell a Toradol shot for her migraine, which Cantrell opined was "related to her sinuses." (Tr. 238.) Over two years later, on May 15, 2008, Nurse Finley completed and signed an ability to do work-related activities form in which she listed degenerative disc disease of the cervical spine, fibromyalgia, carpal tunnel syndrome, tendonitis, sciatica, bone spurs, and depression as the underlying medical findings for her assessment of Cantrell's function. (Tr. 527.) In that report, Nurse Finley concluded that Cantrell could only lift or carry a total of ten pounds, stand or walk a total of two hours, and sit a total of six hours in a eight-hour workday. She also concluded that Cantrell has limited ability to push or pull with her upper extremities. (Tr. 527.)

During the period of November 21, 2005, through August 1, 2006, Cantrell received treatment from the Thurston Medical Clinic (the "Thurston Clinic"). Stephen Ames, M.D. ("Dr. Ames"), first treated Cantrell on November 21, 2005, when she sought care for her ongoing conditions. (Tr. 315.) That day, Cantrell complained about an ongoing sinus infection, fibromyalgia, and degenerative disc disorder at C3-4 in her neck. (Tr. 315.) After a clinical assessment, Dr. Ames noted that Cantrell had multiple trigger points in her back and leg, but that she also had trigger points that didn't consistently correspond. (Tr. 315.) Dr. Ames praised Cantrell for decreasing her smoking habit to a half of a pack of cigarettes each day, noting that she really needed to stop smoking. (Tr. 315.) He wrote Cantrell a prescription for Percocet to alleviate pain from her sinus infection, and Neurontin to ease her fibromyalgia and neck pain. (Tr. 315.)

On January 19, 2006, Cantrell returned to Dr. Ames complaining that she had "headaches

OPINION AND ORDER                    9                    {CKH}

in the neck" and "sciatica nerve pain on the right." (Tr. 313.) Upon palpation, Dr. Ames found Cantrell very tender in the bursa area on the right hip and prescribed Prednisone. (Tr. 313.) Dr. Ames also opined that the headaches were probably tension headaches, not migraines, and were related to her sinus problems. (Tr. 313.)

In April 2006, Cantrell saw Eric Geisler, M.D. ("Dr. Geisler"), at the Thurston Clinic. She complained of a worsening pain going down her leg, and claimed that chronic pain medications were not working. (Tr. 307.) Dr. Geisler reported tenderness over her superior gluteus on the right side, but assessed that her fibromyalgia hindered the extent of his exam. (Tr. 307.) On April 12, 2006, Dr. Geisler wrote in his notes that he had suggested to Cantrell that she quit smoking "for her chronic nocturnal cough," and noted again on April 19, 2006, that Cantrell "has to cut down on her smoking." (Tr. 305, 307.)

On January 1, 2006, X-ray images ordered by Richard Lindquist, M.D., of Cantrell's lumbar spine showed no degenerative changes and generally a normal lower spine. (Tr. 322.) Results from an MRI of the lumbar spine on April 13, 2006, were also normal. (Tr. 317.)

In May 2006, Cantrell began a four-month period of treatment at Thurston Clinic with Dr. Kaplan. (Tr. 304.) On May 5, 2006, Dr. Kaplan gave Cantrell a shot of Toradol to ease her migraine pain. (Tr. 304.) Cantrell returned three days later to get better acquainted with Dr. Kaplan. Cantrell explained that she got migraines nearly everyday and that she had severe migraines at least four times a month. (Tr. 302.) From Cantrell's description of her headaches, Dr. Kaplan opined that the migraines were of the common variety with nausea, vomiting, photophobia, and phonophobia. (Tr. 302.) Dr. Kaplan prescribed Topamax for Cantrell's migraines. (Tr. 302.) Cantrell also reported going to the emergency room over the weekend, where doctors had diagnosed her with a heel spur

in her right foot. (Tr. 302.) Several days later, on May 8, 2006, during a visit where Cantrell complained of knee and right heel pain, Dr. Kaplan noted that Cantrell was smoking one pack of cigarettes or one half pack of cigar-type cigarettes a day. (Tr. 301.) Dr. Kaplan encouraged Cantrell to quit and offered support when she was ready to stop smoking. (Tr. 301.)

Cantrell returned to the Thurston Clinic on May 18, 2006, to ask for a shot of Toradol, which Dr. Kaplan provided that day and then repeated on May 22, 2006. (Tr. 301, 298.) Dr. Kaplan had dissuaded Cantrell from getting an injection of Toradol on May 12, 2006, insisting that Cantrell needed to allow some time for the Topamax to be effective. (Tr. 300.) On May 22, 2006, Dr. Kaplan noted that Cantrell had sought injections of Toradol from the Thurston Clinic or the emergency room two or three times a week over the last several weeks. (Tr. 298.) On June 13, 2006, Cantrell reported that she was having fewer sinus headaches, which Dr. Kaplan linked to the changing of the seasons. (Tr. 296.)

On June 23, 2006, Cantrell returned for another shot of Toradol for a migraine resulting from a pulled muscle in her shoulder. (Tr. 295.) During that visit, Cantrell discussed her disability paperwork with Dr. Kaplan, who reported that "twenty minutes were spent with this patient reviewing her work form and the extent of her disability." (Tr. 295.) On June 30, 2006, Dr. Kaplan reported that Cantrell was still smoking a half pack of cigarettes each day. (Tr. 294.)

Dr. Kaplan and Cantrell took another twenty minutes to complete the "questionnaire regarding her disabilities . . . with the patient's assistance" on August 1, 2006. (Tr. 292.) In that report, Dr. Kaplan wrote that Cantrell could only lift or carry a total of ten pounds, stand or walk a total of two hours in an eight-hour work day, and sit periodically in alternation with standing during an eight-hour workday, but that her ability to push or pull was not limited. (Tr. 289-290.)

OPINION AND ORDER                    11                    {CKH}

Additionally, Dr. Kaplan reported that Cantrell's manipulative function was limited except in her ability to feel. (Tr. 291.) Finally, Dr. Kaplan concluded that Cantrell had severe and persistent asthma that was exacerbated by temperature extremes; dust, humidity or wetness; and fumes, odors, chemicals, and gases. (Tr. 291.) Dr. Kaplan completed and signed a second ability to do work-related activities form on April 16, 2007, in which she concluded that it would be difficult for Cantrell to regularly attend a job as a result of her frequent, yet unpredictable, headaches. (Tr. 378.) Unlike in the previous form, Dr. Kaplan reported on April 16, 2007, that Cantrell had unlimited manipulative limitations. (Tr. 379.)

On August 15, 2006, the Department of Human Services referred Cantrell for a comprehensive psychological evaluation with Dr. Scott. (Tr. 324.) As part of the evaluation, Cantrell self-administered a Personality Assessment Inventory and Wechsler Adult Intelligence Scale, among other tests. (Tr. 327-78.) Results from the testing indicated that Cantrell's foremost mental impairment was borderline personality disorder. (Tr. 330.) Dr. Scott concluded that Cantrell's "significant mental health impairment" would affect her daily living and work life. (Tr. 330.) Finally, after learning from Cantrell that her history of substance abuse had ended ten years prior, except for "the occasional hit of pot," Dr. Scott opined that Cantrell was "likely underreporting her marijuana use given her significant history of substance abuse." (Tr. 327, 330.) During an office visit on June 26, 2006, Dr. Kaplan also diagnosed Cantrell as having a borderline personality disorder based on her chronic instability in relationships. (Tr. 296.)

On August 22, 2006, state agency physician Martin Kehrli, M.D. ("Dr. Kehrli"), analyzed the severity of Cantrell's alleged physical impairments. He concluded that Cantrell's multiple allegations were "minimally partially credible" because the medical record did not support Cantrell's

conclusions about her symptoms. (Tr. 333.) He relied on previous testing that revealed the bulges in Cantrell's spine were minor and appropriate for her age. (Tr. 333.)

On August 28, 2006, Paul Rethinger, Ph.D. ("Dr. Rethinger"), reviewed Cantrell's mental health record. (Tr. 335.) Dr. Rethinger concluded that Cantrell had depression, but that it wasn't severe. (Tr. 347.) Also, he noted that Cantrell had identified her physical limitations as her main issue. (Tr. 347.) Dr. Rethinger determined that her mental health conditions placed mild restrictions on her daily life and social functioning, but none on her ability to maintain concentration, persistence or pace. (Tr. 345.)

The Oregon Department of Human Services referred Cantrell to Options Counseling Services of Oregon ("Options Counseling"), where she received counseling from licensed social workers, primarily Shelley Morris, L.C.S.W., ("Morris") from October 9, 2006, to November 13, 2007. (Tr. 471-525.) On March 19, 2007, Cantrell admitted that she had a felony on her record from writing a bad check for merchandise in Illinois. (Tr. 498.) During a discussion with Morris about her childhood on August 20, 2007, Cantrell admitted that she had stolen money when she was twelve years old, and continued to steal periodically afterwards. (Tr. 477.)

On November 17, 2006, Cantrell underwent testing to determine what was wrong with her sinuses. A Computed Tomography (a "CT") image of Cantrell's sinuses on June 1, 2006, had revealed no evidence of significant sinus inflammatory disease. (Tr. 316.) This November CT scan of her paranasal sinuses again showed no signs of abnormal mucosal thickening or abnormal fluid. (Tr. 375.) Dr. Kaplan interpreted the scan as normal and referred her to allergist, Dr. Kraig Jacobson, M.D. ("Dr. Jacobson"), to rule out an allergic reaction. (Tr. 371.) After testing, Dr. Jacobson concluded on November 22, 2006, that Cantrell had no allergic sensitivities, but that "she

OPINION AND ORDER                    13                         {CKH}

does have both hands firmly on the self destruct button with her continued smoking." (Tr. 365.) Dr. Jacobson observed: "[Cantrell] already has a significant decrease in PFTs and much of her upper airway symptoms are really caused by this irritation." (Tr. 365.) At the conclusion of the exam, Dr. Jacobson recommended to Cantrell that she start using the new Chantix to stop smoking. (Tr. 365.)

A subsequent X-ray of Cantrell's cervical spine on March 19, 2008, at the Medford Radiological Group (the "Group") showed "marked multilevel degenerative changes . . . with posterior facet hypertrophic change." (Tr. 544.) Brian Tryon, M.D., of the Group recommended an MRI for further evaluation. (Tr. 544.) There are no results from a subsequent MRI in the administrative record or any indication that one was administered.

III.  ALJ Decision

The ALJ found that Cantrell suffered from a severe combination of asthma in a smoker/recurrent sinusitis, obesity, mild type II diabetes, heel spurs, an affective disorder (major depression), and a borderline personality disorder. (Tr. 30.) However, the ALJ also found that medical evidence in the record, specifically X-rays and MRIs during 2005 and 2006, did not support Cantrell's allegations that she suffered from degenerative disc disease and disc bulges. (Tr. 31.) The ALJ found Cantrell retained the "residual functional capacity to perform light work . . . except due to respiratory issues, she needs to avoid concentrated exposure to fumes, gases, et cetera. Employment requiring standing or walking over one half hour continuously is precluded. Close contact with coworkers is precluded. Interaction with the general public is precluded." (Tr. 33.) Accordingly, the ALJ concluded that Cantrell was not disabled under the meaning of the Act at any time from April 20, 2005, through February 21, 2008. (Tr. 27.)

In reaching this conclusion, the ALJ found Cantrell's statement regarding the intensity,

persistence, and limiting effect of her pain to be not credible because the majority of her alleged

ailments were not supported by objective medical evidence, and the diagnosis of a borderline

personality disorder suggested exaggeration.  (Tr. 34, 36.)  For example, the ALJ contrasted

Cantrell's hearing testimony about her limited hand dexterity to Dr. Kaplan's assessment that

Cantrell was free from manipulative restrictions on April 16, 2007, as well as the lack of Cantrell's

reporting on the issue to her doctors, before concluding that Cantrell had not suffered from carpal

tunnel syndrome since 2002.  (Tr. 35.)  One of the ALJ's reasons for discrediting Cantrell's

statements was her non-compliance with the multitude of recommendations from her care providers

to stop smoking.  The ALJ specifically referenced the recommendation of Dr. Jacobson, who

determined that Cantrell's continued smoking, and not allergies, had caused her sinus irritation. (Tr.

35.)

As a result of finding Cantrell's testimony incredible, the ALJ discounted Nurse Finley's

assessment that Cantrell's headaches, cervical radiculopathy, degenerative disc disease, and bulging

discs at the cervical neck would be extremely limiting because she apparently based those diagnoses

entirely on Cantrell's reporting, as radiodiagnostics did not reveal any significant neck impairments.

(Tr. 35.)  For the same reason, the ALJ discounted treating physician Dr. Kaplan's report that

degenerative disc disease, asthma, and chronic headaches restricted Cantrell's ability to work,

because Dr. Kaplan assumed these impairments existed without objective medical evidence to

support such a conclusion.  (Tr. 35.)

*Standard of Review*

The Act provides payment of Benefits to people who suffer from physical or mental disability

through DBI if they have contributed to the Social Security program and through SSI, even if they

OPINION AND ORDER                           15                           {CKH}

have not, but have limited income. 42 U.S.C. § 423(a)(1) (2006) (DBI); 42 U.S.C. § 1382(a) (2006) (SSI). The disability criteria are the same for both Benefits. 20 C.F.R. § 404.1520 (2006) (DBI); 20 C.F.R. § 416.920 (2006) (SSI). The claimant bears the burden of proving her disability in order to qualify for either Benefit. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996) (DBI); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992) (citation omitted) (SSI).

To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to cause death or to last for a continuous period of a least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual is disabled by this definition only if her physical or mental impairment or impairments are so severe that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has developed a five-step sequence for evaluating whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920; *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DBI); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). If the Commissioner finds the claimant is disabled after any of the five steps, it is not necessary to evaluate the claimant under the remaining steps. First, the Commissioner determines whether the claimant is engaged in substantial gainful activity. If the claimant is engaged in such activity, the claimant is ineligible. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments in step two. 20 C.F.R. §§ 404.1520(c), 416.920(c). A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* If the claimant has no severe impairment

OPINION AND ORDER                    16                    {CKH}

or combination of impairments, she is ineligible.

Otherwise, in step three, the Commissioner determines whether that severe impairment or combination thereof equals one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If one or more impairments is listed or equals a listed impairment, the claimant is conclusively presumed to be disabled. *Id.* If not, the Commissioner, in the fourth step, determines whether the impairment prevents the claimant from performing work that she has performed in the past. 20 C.F.R. §§ 404.1520(f), 416.920(f). For this analysis, the Commissioner evaluates the claimant's residual functional capacity ("RFC"), which represents the type of work activity the claimant can still perform. *Id.* In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal citation omitted); *accord* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If the claimant is able to perform work that she has performed in the past, the Commissioner makes a final decision that the claimant is "not disabled," and the claimant is ineligible for Benefits. *Id.*

If the claimant is unable to do work she has performed in the past, the Commissioner determines in the fifth and final step whether the claimant can perform other work in the national economy, considering her age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant is entitled to Benefits only if she is not able to perform other work. *Id.*

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence from the record. 42

OPINION AND ORDER                    17                    {CKH}

U.S.C. § 405(g) (2006); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins*, 466 F.3d at 882. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).

If the evidence can support either affirming or reversing the ALJ's conclusion, the reviewing court may not substitute its judgment for that of the ALJ. *Robbins*, 466 F.3d at 882 (citation omitted). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and defining ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). However the reviewing court "may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotations omitted).

*Discussion*

## I. Cantrell's Credibility

Cantrell argues that the ALJ's reasons for rejecting her testimony, particularly the reliance on her continued smoking, borderline personality disorder, past illegal activity, and the lack of objective medical evidence to support her reports of neck pain, are not supported by the record. (Pl.'s Br. at 18.) The ALJ conducts a two-step analysis to assess subjective claimant testimony. Under step one, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptom. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)). If a claimant meets this threshold, under step two the ALJ may reject testimony about the severity of the claimant's symptoms as long as the ALJ provides specific, clear, and convincing reasons for doing so. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). The

ALJ may consider various factors in weighing a claimant's credibility, including: (1) ordinary indications of untruthfulness, such as prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities inconsistent with alleged symptoms. *Tommasetti*, 533 F.3d at 1039 (internal citations omitted). "Contradiction with medical records is also a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) (internal quotation omitted). The ALJ's overall credibility finding may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are supported by the record. *See Batson*, 359 F.3d at 1197.

Here, the ALJ found that while Cantrell's medically determinable impairments could reasonably be expected to produce some symptoms, her statements concerning the intensity, persistence, and limiting effects of her headaches, neck pain, carpal tunnel syndrome, and other conditions were not credible to the extent they were inconsistent with the RFC. (Tr. at 34.) The ALJ points to three of Cantrell's behaviors that generally suggest she was evasive or duplicitous: 1) the medical record supportive of a borderline personality disorder; 2) her propensity to steal when she was younger and her recent felony conviction for writing a bad check;[6] and 3) Dr. Scott's report that he believed Cantrell was underreporting her marijuana use. (Tr. 36-37.) As long as the ALJ makes specific findings that are supported by the record, the ALJ may discredit the claimant's allegations

---

[6]The ALJ provides an incorrect citation to the record for Cantrell's admission that she was convicted of a felony for writing a bad check to buy merchandise when she lived in Illinois. (Tr. 37.) The correct source for that evidence is a counseling session with Morris on March 19, 2007. (Tr. 498.)

based on relevant character evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

Cantrell incorrectly claims that the ALJ erred in considering her past criminal record and personality disorder diagnosis for the credibility analysis because, while the ALJ used these indicators to discredit Cantrell's testimony generally, they are specific findings of allowable character evidence supported by the record. In determining the credibility of testimony, the ALJ may consider a claimant's reputation for truthfulness. *Burch,* 400 F.3d at 680 (internal citation omitted). "For instance, 'if a claimant has a reputation as a liar, . . . that may be properly taken into account in determining whether or not his claim of disabling pain should be believed." *Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989). Similarly, Cantrell's past conviction for writing a bad check, Dr. Scott's conclusion that Cantrell was minimizing her drug use, and the borderline personality disorder diagnosis bear on Cantrell's general reputation for truthfulness. Thus, the ALJ did not err in considering how these factors affected the credibility of Cantrell's testimony.

Even if the ALJ had erred in relying on general evidence of untruthfulness, the ALJ further supports the adverse credibility finding by identifying objective medical evidence contradicting Cantrell's pain testimony. Cantrell charges the ALJ with substituting lay opinion about the severity of Cantrell's back and neck pain for that of her treatment providers, Nurse Finley and Dr. Kaplan, who reported in ability-to-work statements that degenerative disc disease limited Cantrell's functioning. (Pl.'s Br. at 18.) The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints – "[g]eneral findings are insufficient." *Burch,* 400 F.3d at 680. Although lack of medical evidence can not form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis. *Id.* at 681.

In *Burch*, the Ninth Circuit found that the ALJ properly discredited Burch's testimony after

considering, in part, that MRI and X-ray imaging revealed "only mild degenerative disc disease at L5-S1, and mild dextroscoliosis" without apparent disc herniation or nerve root impingement. *Id.* The ALJ in this case relied on both the lack of objective medical evidence, as well as other general findings of Cantrell's lack of credibility, to reject Cantrell's testimony regarding the severity of her neck pain. The medical evidence that conflicted with Cantrell's reports of severe neck pain were: 1) a June 2005 neck X-ray that showed only age-compatible degenerative changes with no acute pathology; 2) "a normal August 2005 MRI with the exception of minimal posterior disc bulge and/or marginal osteophytes" at C5-6; and 3) a normal 2006 MRI of the lumbar spinal region. (Tr. 31.)

The ALJ did not discuss a March 19, 2008, X-ray that revealed "multiple degenerative changes of the posterior facets" in Cantrell's spine. (Tr. 544.) Section 405(g) expressly provides for remand when new evidence is material and there is good cause for the failure to incorporate the evidence in a prior proceeding. *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (citation omitted). To meet the materiality requirement, the new evidence must bear directly and substantially on the matter. *Id.* The court does not find this most recent X-ray to be material because the results were not conclusive of acute pathology that would have supported Cantrell's testimony about the severity of her neck and back pain. Thus, the court need not address whether it was error for the ALJ to omit the X-ray taken February 21, 2008, even though it was absent from the record with which the ALJ assessed Cantrell's disability. (Tr. 40.)

Cantrell also contends that the ALJ improperly relied on her inability to cease smoking as a reason for discrediting testimony about the severity of her headaches. (Pl.'s Br. at 18.) Specifically, Cantrell argues that the ALJ should have demonstrated that Cantrell's ability to work would be restored if she stopped smoking before relying on that reason. (Pl.'s Br. at 18.) The ALJ

cites four specific notes from care providers about Cantrell smoking fifteen cigarettes to a pack a day, but reports that there are many more instances of this notation in the record. (Tr. 34.)

The ALJ properly referenced Cantrell's refusal to stop smoking to suggest that Cantrell "was not so limited as to see the need to aggressively pursue remedies," an indicator that her pain was not as severe as her testimony made it seem. (Tr. 35.) Reliance on evidence in the record of a claimant's failure to comply with recommended treatment constitutes a legitimate reason for discounting her credibility. *Fair*, 885 F.2d at 603. The Ninth Circuit held in *Byrnes* that the ALJ "must examine the medical conditions and personal factors that bear on whether a claimant can reasonably remedy his or her impairment." *Byrnes v. Shalala*, 60 F.3d 639, 641 (9th Cir. 1995) (citations omitted). However, that opinion merely required that the ALJ do so before *entirely* basing a denial of benefits on noncompliance with treatment. *Id.* The Ninth Circuit has not held, and did not suggest in *Byrnes*, that when noncompliance is merely one of the reasons for determining a claimant is less than credible, it is necessary for the ALJ to make the additional finding that but for smoking the claimant would be able to work. *Sorg v. Astrue*, No. C09-5063KLS, 2009 WL 4885184, at *13 (W.D. Wash. Dec. 16, 2009). In *Sorg*, the ALJ considered Sorg's noncompliance with recommended treatment as one factor in discrediting her testimony. *Id.* at *12. As in *Sorg*, the ALJ considered Cantrell's unexplained refusal to stop smoking, despite a multitude of medical direction to do so, as a specific reason to dismiss her testimony regarding her headaches in addition to several general indicators that Cantrell was less than truthful.

Cantrell correctly points out that the ALJ failed to consider Cantrell's frequent visits to the emergency room and the Thurston Clinic during May 2006 for Toradol injections to relieve headache pain. (Pl.'s Br. at 11.) However, the court finds that this single omission is not grounds for

assigning error to the credibility determination because the ALJ specifically references Cantrell's noncompliance with directives to discontinue smoking before discrediting Cantrell's pain testimony about her headaches. The record shows that even though Cantrell understood that her headaches were related to her sinus irritation, which Dr. Jacobson had diagnosed as caused by her smoking habit, and she received recommendations to stop smoking from almost every care provider, she continued smoking. Based on that evidence, the ALJ properly discredited Cantrell's testimony as to the severity of her headaches. Overall, the ALJ considered relevant indicators of credibility, and offered clear and convincing reasons for not fully crediting Cantrell's reports about her pain.

## II. Medication Side Effects

Cantrell alleges that she suffered severe side effects from her medications, including fatigue, poor balance, difficulty concentrating, and impaired driving ability. (Pl.'s Br. at 17.) Contrary to Cantrell's contention that the ALJ ignored these side effects in the RFC analysis, the ALJ inserted into the decision segments of Cantrell's reports about her limitations from taking medications, and dismissed that testimony as exaggerated after finding Cantrell to be less than fully credible. (*Id.*)

The ALJ took into account Cantrell's reports about how her medications affected her activities. "I can't drive far due to medications. I don't dare try to go further than a few blocks to the store or bank or bus stop for my son. All my medications make me drowsy, dizzy, or fatigued – if not all of the above at once." (Tr. 34.) The ALJ found Cantrell to be inconsistent in her reports about the side effects of her seventeen medications, and found her reporting of activities to indicate that she was still able to drive short distances on a daily basis. (Tr. 34.) The ALJ questioned how Cantrell's testimony that she could not drive on her medications could be credible in light of the evidence that she drove to therapy sessions and to pick up her son from school. (Tr. 34) Inconsistent

statements are one common basis for discrediting claimant testimony, as described above. And, while there may be reasonable explanations for this inconsistency, "if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193. Based on the foregoing, the ALJ did not create a reversible error by determining that Cantrell's testimony regarding her medications was less than fully credible.

### III. Opinions of Dr. Scott, Dr. Kaplan, and Nurse Finley

Cantrell argues that it was legal error for the ALJ to reject the medical opinions of Dr. Scott, Dr. Kaplan, and Nurse Finley. (Pl.'s Br. at 17.) Specifically, Cantrell argues that Nurse Finley and Dr. Kaplan relied on their own clinical observations when opining that Cantrell suffered from degenerative disc disease, carpal tunnel syndrome, and other ailments. (Pl.'s Br. at 15.) In addition, Cantrell contends that the ALJ did not mention Dr. Scott's borderline personality disorder diagnosis, and did not provide reasons for that omission. (Pl.'s Br. at 13.)

"Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001). In fact, the ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted. *Batson*, 359 F.3d at 1195. If the treating physician is not contradicted by another acceptable medical source, the ALJ can reject it only for clear and convincing reasons. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002). If the treating physician's opinion is contradicted by a non-examining physician, the opinion of the non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester*, 81 F.3d at 831 (citation omitted). It may constitute substantial evidence if it is consistent with other evidence in the record.

*Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989).

Additionally, when two opinions are contradictory, discrediting opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings, is an example of a clear and convincing reason. *Tonapetyan*, 242 F.3d at 1149. The ALJ may also reject portions of a physician's opinion predicated on reports of the claimant properly deemed not credible by the ALJ. *Ryan v. Astrue*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008).

### A.  Dr. Scott

Dr. Scott examined Cantrell one time for a comprehensive psychological evaluation.  (Tr. 324.) After Cantrell performed psychological and intelligence testing, Dr. Scott opined that Cantrell "clearly has significant mental health impairment that would interfere with her ability to perform basic work tasks." (Tr. 330.) Dr. Scott indicated that Cantrell's mental health restrictions would necessitate a work environment in which Cantrell has little contact with the general public and with a supervisor who has significant patience for her mood swings, as a result of her borderline personality disorder.  (Tr. 330.)

The ALJ acknowledged this examination three times throughout the opinion.  First, the ALJ credited this opinion by naming Cantrell's borderline personality disorder as a severe impairment. Second, the ALJ relied on the opinion when mentioning another of Dr. Scott's conclusions that Cantrell's marijuana use might be increasing her depression and interfering with her medication. (Tr. 37.) Third, while the ALJ does not specifically refer to Dr. Scott's assessment of Cantrell's workplace limitations in the RFC analysis, the ALJ did recognize the restrictions identified by Dr. Scott by prohibiting close contact with coworkers and the general public in the final RFC. (Tr. 33.)

The ALJ's treatment of Dr. Scott's opinion is proper because the ALJ did not discredit this

examining psychologist's assessment. The opinion of an examining doctor, even if contradicted by another doctor, can only be *rejected* for specific and legitimate reasons that are supported by substantial evidence in the record. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (emphasis added). Otherwise, the ALJ need not discuss all evidence presented, but "must explain why 'significant probative evidence has been rejected.'" *Van Sickle v. Astrue*, 385 F. App'x 739, 741 (9th Cir. 2010) (quoting *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).

Cantrell contends that the lack of discussion of Dr. Scott's diagnoses and the absence of a justification for rejecting his assessment of her mental limitations was a legal error. (Pl.'s Br. at 13). On the contrary, the ALJ never discredited Dr. Scott's mental health diagnoses or rejected his assessment of Cantrell's function in the workplace. In fact, the ALJ's opinion includes all of Dr. Scott's conclusions, except that "Cantrell will likely need significant one-on-one assistance to work on developing job tasks." (Tr. 330.)

Instead of specifically including this last recommendation, the ALJ adopted the general conclusions of Dr. Rethinger, a reviewing psychologist, regarding Cantrell's restrictions in daily living, concentration, pace, and persistence. Like Dr. Scott, Dr. Rethinger concluded that Cantrell's daily activities were restricted by her mental impairments. However, Dr. Rethinger concluded that Cantrell's mental impairments were not severe, relying in part on Cantrell's statement that her physical impairments were her main limitation. (Tr. 347.) This is consistent with Dr. Scott, who prefaced his conclusion that Cantrell would need individual supervision by noting that Cantrell claimed she could perform work tasks if not impaired by her physical limitations. (Tr. 330.) Based on the consistency between these two opinions with regard to Cantrell's basis daily living and her insistence that physical limitations created her main restrictions, the ALJ properly addressed Dr.

Scott's recommendation of individual supervision related to Cantrell's basic functioning.

  *B. Dr. Kaplan and Nurse Finley*

  Both Dr. Kaplan and Nurse Finley completed statements identifying Cantrell's abilities to do work-related activities. Dr. Kaplan completed two statements that directly contradicted each other. (Tr. 289, 377). In the 2006 assessment, Dr. Kaplan concluded that Cantrell had limited manipulative functioning due to her degenerative disc disorder and carpal tunnel syndrome. (Tr. 291.) In Dr. Kaplan's second report a year later, she recorded that Cantrell had unlimited manipulative function, but still noted that Cantrell suffered from degenerative disk disorder. (Tr. 378.) Nurse Finley also noted that degenerative disc disease limited Cantrell's ability to lift, stand, sit, and push, and that carpal tunnel syndrome would restrict Cantrell's use of her hands. (Tr. 527.)

  The ALJ rejected Dr. Kaplan and Nurse Finley's opinions that degenerative disc disease restricted Cantrell's functioning primarily because there was no objective medical support for that finding, and both treatment providers had accepted Cantrell's alleged restrictions based entirely on claimant's own reporting. (Tr. 35.) In addition, the ALJ noted that Nurse Finley's initial examination of Cantrell on June 29, 2005, was completely normal, except for a report of stiffness in the neck and pain at the base of the skull. (Tr. 35.) In rejecting Dr. Kaplan's opinion, the ALJ relied on the fact that Dr. Kaplan was unable to specify actual limitations in most of the report areas, and had opined about Cantrell's mental health limitations, which were outside her expertise as a physician. (Tr. 35.)

  The reasons given by the ALJ in rejecting the limitations described by Cantrell's treating physicians are legitimate and supported by the administrative record. As noted above, the court has found that the ALJ properly rejected Cantrell's testimony as less than credible. Dr. Kaplan's notes

from June 23, 2006, and August 1, 2006, indicate that she spent a total of twenty minutes each day completing work forms and disability paperwork with Cantrell's assistance. (Tr. 292.) Neither Dr. Kaplan nor Nurse Finley's assessment of Cantrell's ability to do work include reliance on objective testing to determine specific restrictions. The ALJ concluded from the administrative record that Cantrell was providing the limitations given in Dr. Kaplan's report. (Tr. 37.) In fact, neither provider included clinical observations to support the conclusion that Cantrell was suffering from degenerative disc disease. Nurse Finley only noted that Cantrell reported some neck and back pain during her first visit. (Tr. 238.)

In addition, the ALJ properly considered the contradicting opinion of non-examining state agency physician, Dr. Kehrli. (Tr. 31.) While the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record. *Tonapetyan*, 242 F.3d at 1149 (citation omitted). Dr. Kehrli's conclusion that Cantrell did not suffer from severe degenerative disc disease was consistent with radiodiagnostic testing from 2005 and 2006. The ALJ's conclusion is consistent with the Ninth Circuit's decision in *Tonapetyan*, which upheld the rejection of medical evidence that was "unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of Tonapetyan's alleged conditions." *Id.*

IV.  Step Two:  Determination of Severity

Cantrell contends that the ALJ erred in not finding her carpal tunnel syndrome, degenerative disc disease, and headaches to be severe impairments at step two of the disability analysis. (Pl.'s Br. at 12.) The Commissioner argues that the ALJ's findings, with regard to the severity of these alleged

OPINION AND ORDER                    28                              {CKH}

impairments, are irrelevant because the ALJ considered all severe and non-severe conditions in identifying Cantrell's RFC. (Def.'s Brief at 5.) Cantrell does not deny that an error in step two was harmless to the final ALJ decision. The court finds that the ALJ did not commit reversible error by concluding these conditions were not severe in step two.

The concept of harmless error is applicable to the review of final decisions made by the Social Security Administration. "A decision of the ALJ will not be reversed for errors that are harmless." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990)). More specifically, to the extent an ALJ errs at step two in concluding that any conditions are not severe, that error is harmless if the ALJ considered the potential effects of those same conditions in determining the claimant's RFC. *McCawley v. Astrue*, 423 F. App'x 687, 690 (9th Cir. 2011) (citing *Burch*, 400 F.3d at 681–83). The Ninth Circuit in *Burch* assumed without deciding that the ALJ's failure to address claimant's obesity during the step two analysis was legal error, but concluded that such error was harmless because it would not have affected the ALJ's analysis at either step four or five. *Id.* At step four, the court found that Burch could not have established that she met a listing requirement or its equivalent based on the record. And, at step five, the ALJ explicitly noted the impact of Burch's obesity on her back problems and resulting physical limitations. *Id.* at 682-83.

Similarly, in this case the ALJ failed to mention in the step two analysis the medical assessments from Nurse Finley and Dr. Kaplan indicating that Cantrell suffered from carpal tunnel syndrome. The ALJ did, however, discuss Cantrell's headaches and neck pain in step two before deciding that those conditions were not severe. (Tr. 30-31.) Regardless, the ALJ discussed all three conditions in detail during the RFC analysis. (Tr. 34-35.) The court finds that this omission in step

two was harmless because it did not affect the outcome of the ALJ's determination in steps three (listing impairment determination) or five (RFC) – the only unfavorable decisions for Cantrell in the sequential process.

Any error in step two did not affect the ALJ's step three finding that none of Cantrell's impairments were separately listed or equal to listed impairments. "Degenerative disc disease" is considered a listed impairment in the SSA Disability Evaluation Blue Book at 1.04 if it results in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. *Disability Programs*, SOCIAL SECURITY ONLINE, http://www.ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm#1_04 (last visited Feb. 15, 2012). Although degenerative disc disease is listed, Cantrell does not present objective medical evidence that her neck and back pain are symptoms of any of the three conditions required to qualify under that listing.

In fact, Cantrell's MRIs since 2005 have been negative for acute pathology. MRI imaging in August 2005 displayed normal morphology and spinal chord signal, and a lack of neural impingement or stenosis. (Tr. 246.) That MRI did show minimal posterior disc bulge at the C5-6 level, but the listing does not contemplate disc bulges as symptomatic of severe degenerative disc disease. (Tr. 246.) Her April 2006 MRI revealed normal appearance of the lumbar spine. (Tr. 317.) Cantrell does not present evidence that even if the ALJ considered her degenerative disc disease a severe impairment, the ALJ would have been required to find that her condition fell under the definition of the listing for the disease.[7] *See Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)

---

[7]As noted before, the court does not find error in the ALJ's omission of evidence from the March 19, 2008, X-ray of Cantrell's spine because the test occurred after the ALJ issued the decision, and the results were not conclusive of acute pathology that would have required the ALJ

("The Ninth Circuit has held that a claimant carries the initial burden of proving a disability.") Without this evidence, the omission of the degenerative disc disease in step two is harmless.

The same is true for Cantrell's carpal tunnel syndrome and headaches. If the impairment is not a separately listed impairment, a claimant will be deemed to meet the requirement if that impairment, in combination with other non-listed impairments, is equivalent to a listed impairment. *Burch*, 400 F.3d at 682 (internal quotations omitted). An ALJ is not required to discuss the combined effect of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence. *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001). In *Burch*, the Ninth Circuit found that Burch did not demonstrate an error because she did not specify which listing she believed she met and did not set forth evidence to support the diagnosis and findings of a listed impairment. *Burch*, 400 F.3d at 683 (citing 20 C.F.R. § 404.1525(d)). As in *Burch*, Cantrell does not present evidence of the specific listing condition she believes she would have met if the ALJ had considered headaches or carpal tunnel syndrome to be severe.

Finally, there was no error in step five of the analysis because the ALJ considered all three of these conditions before determining Cantrell's RFC and vocational ability. Cantrell contends that because these three conditions were actually severe, the ALJ's RFC should have included limitations resulting from each one. (Pl.'s Br. at 12.) However, the ALJ considered each one of these three conditions in step five, and properly chose not to include in the RFC any limitations caused by these conditions that were contradicted by objective medical evidence or based entirely on Cantrell's testimony. (Tr. 34-36.)

---

to classify Cantrell's neck and back pain as a listed impairment or equivalent to one.

Cantrell identified no functional limitations posed by carpal tunnel syndrome, degenerative disc disease, or headaches that the ALJ did not consider in the RFC analysis. *See Burch,* 400 F.3d at 684 (holding that the ALJ adequately considered the claimant's impairment where the claimant had set forth no evidence of any functional limitations that the ALJ failed to consider). First, the ALJ considered but rejected any evidence that Cantrell experienced limitations due to carpal tunnel syndrome during the period at issue. (Tr. 36.) The ALJ considered Cantrell's hearing testimony that she could not pick up coins off a table without sliding them to the edge, but gave greater weight to Dr. Kaplan's most recent April 2007 assessment that Cantrell had no manipulative restrictions. (Tr. 35.) Cantrell argues error based on the ALJ's failure to consider Dr. Kaplan's earlier August 2006 assessment, in which she concluded Cantrell had limited manipulative function. (Pl.'s Br. at 10.) However, the court finds it clear from the ALJ's phrasing, "physician Kaplan concluded most recently," that the ALJ considered Dr. Kaplan's earlier report as well. (Tr. 35.)

Nurse Finley reached the conclusion on January, 15, 2008, similar to Dr. Kaplan's earlier report -- that Cantrell had limited manipulative function for fingering and feeling. (Tr. 528.) Although the ALJ does not explicitly refer to this report, the ALJ considered Dr. Kaplan's similar opinion before concluding the record showed that Cantrell did not raise the issue of her dexterity at any of her medical visits during that time, or otherwise provide objective medical evidence to support that she still suffered from carpal tunnel since her surgery in 2002.

Moreover, because Nurse Finley was not supervised by a physician during her visits with Cantrell or when reporting afterwards, she is not an acceptable medical source. Medical opinions establishing disability must be from an acceptable medical source. Licensed physicians and psychologists are included within this definition, but a nurse practitioner working without the

OPINION AND ORDER                    32                        {CKH}

supervision of a physician does not constitute an acceptable medical source. 20 C.F.R. § 404.1513 (2011); *Gomez*, 74 F.3d at 971. Because the record supports the ALJ's stated reasons for not including manipulative restrictions in the RFC, and because Nurse Finley is not an accepted medical source in the context of disability benefits, the court finds that the ALJ conducted a proper RFC analysis despite failing to specifically reference Nurse Finley's report.

Second, the ALJ dedicated the majority of the RFC analysis to potential restrictions caused by Cantrell's neck and back pain. (Tr. 35.) The ALJ considered all of the evidence that Cantrell highlights in her brief, expect her frequent trips to the emergency room and the Thurston Clinic for Toradol injections during the month of May 2006. (Pl.'s Br. at 11-12.) Specifically, the ALJ considered all the restrictions resulting from Cantrell's degenerative disc disease that were identified by her treatment providers, as well as the results of X-rays and MRIs taken during the period at issue, including the revealed minimal spondylosis at C5-6 of Cantrell's spine. (Tr. 31.) The final RFC reflects some of the limitations identified by Nurse Finley and Dr. Kaplan by restricting Cantrell's capacity to "light work" and prohibiting employment requiring continuous standing or walking over one half hour. (Tr. 33.)

Third, the ALJ considered potential restrictions in Cantrell's work activity caused by her reoccurring headaches. Although the ALJ did not specifically cite Dr. Kaplan's opinion that headaches would be disruptive to work life, the ALJ did consider Dr. Kaplan's opinion in noting "the claimant's non-compliance with medical direction would suggest that the claimant was not so limited as to see the need to aggressively pursue remedies." (Tr. 35.) In other words, the ALJ not only considered but conceded that these headaches may have restricted Cantrell's ability to work before discounting Cantrell's credibility based on her failure to stop smoking in order to treat her

OPINION AND ORDER                    33                         {CKH}

headaches, as discussed above. (Tr. 35.) In doing so, the ALJ relied on the medical opinion of Dr. Jacobson, who linked Cantrell's sinus irritation to her smoking habit after disqualifying allergies as the cause of her sinus pain through objective testing. (Tr. 34.) Cantrell has failed to establish that the ALJ neglected to consider restrictions from Cantrell's degenerative disc disease, carpal tunnel syndrome, or headaches in the RFC analysis. Accordingly, the court finds that any omission of these conditions from the step two analysis was harmless error.

V.  Evidentiary Value of Vocational Hypothetical

Cantrell contends that the hypothetical posed by the ALJ to the VE has no evidentiary value because it did not contain all of Cantrell's restrictions. (Pl.'s Br. at 12.) Cantrell does not specify which restrictions the ALJ omitted, but the court assumes that she refers to restrictions resulting from her alleged carpal tunnel syndrome, degenerative disc disorder, and headaches. In response, the Commissioner defends the validity of the hypothetical on the ground that the ALJ validly analyzed Cantrell's credibility and medical evidence, and properly concluded which restrictions belonged in the RFC. (Def.'s Br. at 9.)

Hypothetical questions posed to a VE must set out all the limitations and restrictions of the particular claimant, including pain and an inability to engage in certain activities. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Otherwise, the VE's opinion regarding work capabilities "has no evidentiary value." *Bain v. Astrue*, 319 F. App'x 543, 545 (9th Cir. 2009). However, the ALJ is not required to include limitations that are not supported by substantial evidence in the record. *Moon v. Barnhart*, 28 F. App'x 666, 668 (9th Cir. 2002).

In this case, the ALJ properly omitted any alleged restrictions from the hypothetical after providing clear and convincing reasons for discounting them in the RFC analysis. As described

above, the ALJ properly discredited Cantrell's testimony regarding the extent of her pain caused by degenerative disc disease, carpal tunnel, and headaches by providing specific instances of untrustworthy behavior and tests results contradicting the existence of those ailments. Furthermore, the ALJ properly rejected the treating providers' assessments of Cantrell's limitations based on the lack of objective medical evidence in the record, and their reliance on Cantrell's discredited testimony and reporting.

## Conclusion

The Commissioner's findings on Cantrell's disability, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner is AFFIRMED.

DATED this 22d day of March, 2012.

_____
JOHN V. ACOSTA
United States Magistrate Judge